All right, I would call United States v. Osage Wind, number 255004. Thank you, Your Honors, and may it please the Court, Miguel Estrada for the Enel Appellant, and I will try my best to save four minutes for rebuttal. Again, you have to keep track of your own time, thank you. I can see it's a tough room. Thank you, Your Honor. My fundamental point today is that the retention today of crushed rock that was severed from the mineral estate years ago is not a continuing trespass, nor a trespass of any kind. It's not an invasion of realty. It is, we concede, a conversion for which we have accepted liability, and for which the Court awarded damages of $245,000 that we are willing and ready to pay. Those damages for conversion under Oklahoma law do not support attorney's fees of several million dollars as were awarded, therefore, we submit that the disposition of the case should be, the injunction should be reversed, the damages for continuing trespasses, trespass should be reversed, the conversion damages should be affirmed. Now, as to the fundamental point, it seems to us cut and dry. Even the government at time concedes that once the rocks were severed and crushed, they ceased being part of the mineral estate and became personality. As a general proposition of law, personality can be converted, but it's not usually the subject of a trespass. With respect to the record here, both complaints affirmatively pleaded that what happened in this case was there was excavation, and under the ruling of this Court, some of the rocks that were obtained in the excavation were crushed. Both of the complaints alleged, and the record is clear, that after the foundation for each of the towers were poured there was concrete that was poured and cured, those rocks were then poured on top of the concrete foundation, so that what we're talking about is crushed rocks that were severed from the mineral estate that are providing backfill support on top of the concrete foundation and around the concrete foundation. It is not part of the mineral estate, estate, excuse me, has not been part of the mineral estate for at least 12 years. That ought to conclude any claim of continuing trespass. All of the additional arguments for the giving of an injunction seem to us also to have a fundamental failing of law. There is the notion that an injunction could be based on the notion that there was an invasion of the tribe's sovereignty. I would say to you that the Supreme Court's ruling in Marion versus Jicarilla, Apache, 1982, Justice Thurgood Marshall opinion for the court is controlling on this point. And I'll just take a second to remind the court of what the case involved. It involved mineral leases given out by the tribe with the approval of the Secretary of the Interior. Didn't part of the district court's analysis with respect to that aspect rely upon the finding of the continuing trespass? Wasn't the notion that tribal sovereignty was not being respected or honored in part because the district court found that there was a continuing trespass and that Enel or your client hadn't gotten a lease in the years since the 10th Circuit's opinion? Yes, that's the second aspect I was going to get to. And I was going to separate the claim of an invasion of sovereignty with the claim that there should be a lease obtained now. So let me deal with the sovereignty point first, which we think is controlled by the Marion case where leases were at issue and there was an effort by the tribe who gave the mineral leases then to tax the income from the leases. And the assertion was no, you've already exercised your sovereign power, you're essentially a stop, this is all you can do. And what the court said was no, with respect to the leases, and this is from page 145 of the court's opinion, 455 U.S., you're essentially a commercial partner, you are not a sovereign. This is what the court said. And to confusing these two things, this is from page 146, denigrates Indian sovereignty. So the court said this is a commercial thing, it's not sovereignty. You can then turn around and tax it as you would any other commercial enterprise. So our point on sovereignty is that yes, we were guilty by not having obtained the lease in 2014, which would have made the entry privileged, and not having settled on a royalty then, which would have then made the taking not a conversion, we were then guilty of a simple trespass and a conversion. A lease under the ruling of this court should have been obtained in 2014. Not having obtained those things, we conceded in the district court that we were guilty of simple trespass and a conversion. Now the question is, the government says, well, it is an affront that merits some injunction that you haven't obtained a lease since. First point of that, under no theory could there be an injunction that ejects us from the surface estate where we have every right to be under the Osage Act and this court's 2017 ruling. So if there were any need to obtain a lease, the remedy could not possibly be that you get ejected from your own property. That's point one. Point two is the government has never given any support for the proposition that the regulation has written. Anywhere contemplate that a lease can be obtained retrospectively. The lease, all of the regulations are framed so that you can obtain a lease to license the entry and then pay for the royalties. And as I'm sure you know, there is a whole body of law having to do with retrospective regulations. There is the Georgetown University Hospital case from 1988 in the Supreme Court where Justice Scalia in his concurring opinion pointed out that when agencies write rules, they have to comply with the APA. And the definition of a rule in the APA are sort of norms that have prospective application as opposed to adjudication by agencies that deal with things that have happened in the past. And the whole thing about a rule, these are rules, they were promulgated by the agency to have prospective application. The agency, neither the agency nor the OMC has ever identified a single passage in any part of the rule that says, this is how you go about licensing conduct that has already occurred. There is not a single sentence that they have identified. They have not identified a government website, promulgation, a single example where this has ever occurred. I will compare the circumstance in 2017 where the government had asserted that we needed what they called a sandy soil permit. And this court found that that had no basis even if they had once pointed to a single example where that had been done. Here they have pointed to no administrative record of anywhere, how to obtain it, where has it ever been done, how to go about it or any language in the regulation that could possibly authorize it. And it would be contrary to the whole concept of the APA, the rules being a prospective application. I will say that should cover the point about the injunction except one more thing, which is also part of why the injunction is unjustified. Even if we were wrong as to anything else, the plaintiffs themselves submitted evidence that their injuries for the purported continuing trespass were compensable by money damages. They submitted the testimony of Haslett, which the court concluded was not reliable. But then the court came up with her own measure of damages based on a regulation that no one had cited. What the Haslett and the regulation have in common is there are measures of damages based on the surface estate. Now one can quibble whether that's wrong, whether that's logical, whatever. But if one accepts their premise that there is a continuing trespass, under their view and the district court's view, this is a continuing trespass that is compensable by money damages. And under hardcore injunction law, it is therefore not a harm that could ever be considered irreparable. Under the ruling that was issued by the court, continuing trespass damages are compensable by a certain sum to be continued at the rate of $8,000 per annum until we tear down the farm. And if that's true, we could capitalize that for the life of the farm and figure out what the harm of the trespass is. But the fundamental point is, you can't have a continuing trespass for the possession of the property that you converted. Well, counsel, let me stop you there. I think the district court found that there's a continuing trespass here because in our prior opinion, we defined mining as exploiting the resource and you're still exploiting the backfill. And that is a continuing trespass. Tell me why you think that is incorrect. That's incorrect as a matter of the ordinary dictionary meaning of mining, as a matter of the regulation, and as a matter of this court's opinion. Oh, okay. Let me start with this court's opinion. Okay. Because that's, and also, I guess a sub-question there is, is that what governs the question of what constitutes mining in this case? Sure. Should we look at anything else or should we just look at what we said in our previous opinion? Well, I think the regulation sort of speaks for itself and if the question of mining were controlling on the question of trespass, you would have to look at the regulation itself rather than the opinion because the opinion may interpret the regulation but if the situation has not exactly arisen, you would have to look at the regulation. My point to you is that this court actually dealt with the question and mining, it conceded, actually requires extraction plus treating. And so you cannot separate the fact that there is no ongoing extraction of anything. There has not been any excavation for more than a decade. And I know this from the passage in 1090 and 91 and footnote 11 of this court's opinion where this court focused on the fact that the phrase directed to the severance had to apply to the entirety of the regulation. Severance, of course, is part of actually going in and getting something out which hasn't occurred in over a decade. How about the word exploitation? Yeah, that's the- By having the backfill still there. Yes, but my point is that this court opinion, this court's opinion each time that it dealt with the exploitation was presupposing that the severance was ongoing because each of those passages speaks of the excavation and asks what more is needed. And the reason that was needed is because this court also conceded that excavation of the dirt by itself would not be mining. So it was looking for the plus factor that would turn it into mining under the facts of the case. If I could save the remainder of my time for rebuttal. Thank you. Thank you, Your Honor. So, just a minute, just a minute. Sorry. No, you may not. No, I agree, I may not. Are you saying that the only reason why this is not exploitation and therefore not mining is because it had already been excavated?  Correct? And in that way- Correct. You do concede, though, that initially there was mining. That is the holding of this case. And so, yes, we do concede that there was mining to the extent that the rocks were taken and crushed, but not merely because of excavation or construction generally. And I would like to reserve the remainder of my time for rebuttal. Thank you. May it please the Court. Nolan Fields for the United States. Working with the Osage Minerals Council, I'd like to reserve five minutes for them and I'll do my best to hold to it. That's your responsibility. Yes, Your Honor. May it please the Court. Here, Enel was never a commercial partner with the United States. So because it had no lease, Marion is inapplicable. Looking, Mr. Estrada offers that there's no offer of how the lease should be obtained retrospectively. The Court already confirmed in its 2017 opinion that a lease needed to be obtained. So for Enel to blame the United States and the OMC for that failure, it's not the victim's job to let them know how to apply for a lease. They've known how to do it since 2013 and they've willfully, and as a bad faith trust passer, which the district court found, refused to take that step. So do you contend that they're still mining? Absolutely. Okay, and explain to me, so this is one of the issues that I struggle with. So I read the 2017 opinion and with respect to extraction, it talks about action upon the extracted minerals for the purpose of exploiting the minerals. So explain to me how this rock that's already been mined, like it was pulled out, it was crushed, it's now just sitting on top. How is that still mining? But his characterization is incorrect based on the facts of the case. It's not just sitting on top of the foundation. It's backfill under the foundation, beside the foundation, and on top of the foundation. And so what the court did in its 2017 opinion laid out four examples that constituted mining, including but not limited to the extraction or excavation, the sorting, the crushing, and the use. And so by including the use, they explicitly explained that the ongoing exploitation was mining, and the court even took the step. Did they include the use as part of the mining or was it action upon the extracted material for the purposes of backfill? The 2017 court specifically disabused ANEL of its attempted narrow reading of the mining regulations. And unequivocally, in that 2017 opinion, it said the problem here is that, and I quote, that Osage Wind did not merely dig holes in the ground. It went further. It sorted, it crushed, and then exploited the crushed rocks as structural support. And there is no dispute that that exploitation continues. So when you want to talk about severance, physical severance, not legal severance, because Osage Wind cannot legally sever unalienable tribal property without a lease. That is the only way they can do it. And so without that lease, that's the reason the court is not, is correctly finding a remedy for this. The backfill is benefiting the surface estate. And as it is now, it's just inert. And has no effect on the mineral sphere. But it's not inert. But for the backfill, if it was removed, these turbines would not be able to function or stand. So it's inherently part of the commercial operation. That's why the court in 2017, even without the benefit of discovery at that procedural procedure of the case, all that had happened was two declaratory questions came up. Is it mining? And is a lease required? And the court came back. And in its four examples that showed what mining constituted, notably only one of them is the extraction. All the other three, sorting, crushing, and use are considered mining. And they are after the minerals have been removed. While they are physically removed, they are not legally severed. And that's the reason the court crafted the ejectment remedy because it cannot be more narrowly tailored. Because if they don't take a lease, there's only one entity that has a say on how tribal property rights can be alienated, and that's Congress. As the litigation progressed, there came a point where the district court inquired whether or not the backfill could be removed. And the lawyer for Jose Gwinn had no answer to that. That's correct. That's over now. But the... Does that mean that part of our solution cannot be that as part of an order sending it back to require that there be an evidentiary hearing as to whether or not the backfill is essential to the continued structure of the term? That was already found in the 2017 opinion. There are multiple places in the 2017 opinion where this court noted how specifically the structural support of the backfill for the turbines, i.e. the use- I absolutely agree. I remember reading it and said it several times because I was looking for it. He did say that. But the other side of the coin is, is it essential? Can it be removed and not adversely affect the stability of the turbine? At the time, when the court specifically had a letter briefing before the motion for summary judgment argument, there was a month advance lead time. And the court said, please explain this point if continuing trespass can be abated by the removal of the backfill. Both the OMC and the United States explained that that was possible and were intellectually honest. And unfortunately, ANEL did not provide any information. It specifically whiffed. And then only after the court had issued its order stating that it was gonna eject the wind farm, that at that point, ANEL ball can come up with a middle-of-the-road replacement option, which was not asked for by the court. The court only asked, how long is this gonna take? So in that briefing, what this is, it goes to an abuse of discretion standard, which is the court should get great discretion to control its own docket. But for the most part, the United States would like to pivot back to why we win. This is not a simple commercial transaction between the parties as ANEL would like to have it be. This is the scale of a trespass that would be the equivalent of 84 wind turbines across 8,400 acres. That's literally the height equivalent of 84 Statues of Liberty across 10 times the size of New York's Central Park. That's also half the size of Boulder, Colorado. The volume of the OMEA issue is over 300,000 tons. So with all of that information, what ANEL does not wanna talk about is that their continued use and exploitation without a lease is continuing trespass, and it's not on some obscure private party. It's on a sovereign tribe, specific reservation of minerals that is to be protected as trustee by the United States. And so they are flouting that, and they cannot alienate something that only Congress has delineated how they could do it. So would you contend that there was still a continuing trespass if they had just taken the backfill off-site? If they don't have a lease, they're still mining. So we can get into hypotheticals of where it's located, but they didn't take it off-site. They literally put it back in place. Right, but when does, I guess, when does mining end to you? Like that's, I'm struggling here. There's only two ways. I'm trying to be honest. It's unfortunate. It's two ways. They either get the lease, which is the way that Congress has said that you can alienate this properly, or they can be ejected. So the problem is with this. I'm sorry. No, it's okay. Just have you repeat that. They cannot end mining activities until they leave or are forced to leave. They could get a lease or they could be ejected. And anything they do is mining up until that point. Well, at this point, the 2017 order has delineated what mining is. There's no reason, I think, for the court to delve into hypotheticals because it's laid out here in 2017. You haven't given us an answer to the hypothetical. You didn't answer Judge Dieter's question about the hypothetical, so I'll ask it again. Yes, ma'am. They take the backfill or whatever, the material, and they take it 1,000 miles away and they build a road with it, and that material is sitting there. Is that mining? Yes, it is mining. It is mining. Okay, so how is the 1,000 mile away mining? This court in 2017, it's mining because they don't have a lease. If they were allowed a certain distance or a certain amount of money, that would obviate the fact that there are federal regulations and sovereignty. It's specifically regarding that. Otherwise, you would have no one ever seek the lease. All they would do is rush to quickly get it out of the ground, like the land rush, ironically, in Oklahoma, so that they wouldn't have to comply with the regulations and they could pay a paltry amount, which is not what the Congress has authorized. Okay, so I understand now. You're saying because of the sovereignty element, this is different. And because of what Congress has said, the only way that it can be severed is one way. So the court in 2017, and I'll quickly end, said, quote, this type of mining does not fit nicely into the traditional notions of mining as the term is commonly understood. So as much as Enel would like to pay for their trespass and make it seem simple, it is nothing but because they never addressed the sovereignty of the Osage Nation and they have illegally attempted to sever unalienable tribal property. Thank you. Thank you. May it please the court, my name's Jeffrey Rasmussen. For the Osage Minerals Council, I'm going to try very hard not to refer to them as the tribe, but I do it all the time. So I wanted to turn to Judge Murphy's question about the, excuse me, what Enel now claims is the narrower option. And what they're talking about is, what they're talking about is lifting the existing wind structures up, removing the rock that is the use that they've admitted they're still using it, and then taking the Osage Minerals rock out and replacing it with rock that they purchased elsewhere. And in many cases, when you're dealing with, is there a narrower option, you're dealing with something where the court can see there's a narrower option. And in this case, what the court, the district court asked Enel was not, is this an option, but is this possible under construction methods? And Enel said, there's no evidence in the record of that. There's no evidence to support that in the record. That's what they said. The court then issued the summary judgment based upon that. So when we're talking often about narrower options, we're talking about something the court can say, oh, there's a narrower option. You can just not, you can allow the protesters closer or things like that that we know are possible. Here, the court's question went to the facts of is it factually possible? And Enel said, no, there's no evidence in the record of this. And the court then issued its decision saying, we're going to have to evict the wind farm because there's no evidence in the record of this other option being possible. And it was only after that that Enel then submitted what it calls the replacement option, and it did so improperly. The court had asked for a briefing on a particular topic, and Enel volunteered, oh, can we go back to that? And that's one of the reasons we're 15 years into this, almost 15 years into this case, is that Enel goes for their big win, and when they lose, they then go back and say, let me try this one again. And so what they're trying to do now with this option is exactly what the judge asked, which is, well, could we remand? And that's what Enel wants, because then they get another five years of operating this wind farm before it can be removed. So no, it is not an option under the record of this case. Similarly, Enel said, yes, we are still exploiting those minerals because we are using them as the foundation upon which these turbines sit. So we basically have 84 mines on this land, 84 mines that don't have a lease on this land where they're using the minerals, they're exploiting the minerals, and I wanted to go back to why that was part of the prior case. Let me ask you this. What if, I have one of those what ifs for you, what if this court just does not buy the sovereignty issue and says, no, this is all proprietary, you have non-tribal members with head rights that are affected by this, so it can't be solved? Right. Accept that. Right. But also accept the proposition that the continued presence of the backfill is deemed to be mining. What then? The company can say, well, we expect millions of dollars for this, and Enferno says, well, it's not worth millions of dollars. There are law grants. What if no new lease can be accomplished? What then? Well, as far as legally a new lease can be accomplished, that wasn't an argument that I recall them making in their brief that they can't go back and retroactively do it, but it can be. As far as if the court said there's no sovereignty, you get back to basic property rights, which is if you're on the property and you don't have the right to be there, and they don't have the right to have their 84 mines there, that that would be a violation of basic property rights. So even separate from the tribal interests, but their reading of Marion is just completely wrong, so we'd ask the court to look at that carefully. Because the court- Let me ask you this. Based on what you just said, if that is so, but we also disagree that with the district court as to its measurement of rental for the trespass, we remand it then to the district court to have a new hearing on what the reasonable rental value would be of this area that is filled with backfill? I think we did not appeal on that issue. We thought the court's decision on that was wrong, but what it's talking about is $8,400 when it was saying that the wind farm's going to have to be removed, and until, so in that interim, $8,400 until it is done. So the court was very clear that it was saying this is just an interim measure, because it's not a full measure of the damages or the full remedy. The full remedy is removal of that wind farm. That is what we want now, in part because of some of the things that Danelle has said in its brief and in its arguments that we view as disrespectful to the Osage nation and to the OMC as part of a sovereign. Thank you. Thank you. Could you add two minutes to rebuttal because of the court's questions? Thank you, Your Honor. Let me start by adding that there has been no rebuttal on the fundamental point that this is personality and not realty. We can have a debate as to the meaning of mining if there were mining, which I'll get to, but this is a conversion and not a trespass, irrespective of the meaning of mining. But let me first address the questions that were raised first by Judge Teeter, followed up by Judge Ide, and then the question that was raised by Judge Murphy. First, the off-site versus on-site does matter because the regulation says what it says, and if hypothetically this were an emerald mine and I had gone in without a permit and stole the emeralds and converted them into earrings for my spouse, you know, the fact that she was still going around wearing the earrings would turn it into a conversion. A remedy could be replevin given back, in which case you would not be entitled to also seek damages for the value of the emeralds, or it could be give me the damages for the conversion, in which case you would not get the emeralds back too. You can't get both of those things, right? And so here, if you are getting the damages for the conversion, ordinarily you would not also get an injunction to get the rocks back. It's essentially a forced sale. That's point one. Point two, on the mining point, the text of the definition, both in the general definition, refers to severance and doing something which has been severed, and then there is an exception that refers to extraction of no more than 5,000 cubic feet per year. Neither of those things would make sense if the passive possession of something could be mining because the extraction on a per annum basis would stop applying on year two. And so as a textual interpretation of the regulation, the notion that the continuing possession of something that was extracted years ago being mining, if that were still relevant, wouldn't make any sense because it would make a hash of the language of the regulation. Point three, this court's opinion said that we should have had a lease in 2014. It didn't say when it's available now. It did not purport to construe the regulations. The consequence of that, of course, is we have, since we didn't have one, we have to pay damages for the conversion. Judge Murphy, the 2023 summary judgment hearing is very long, and we truthfully answered when asked could you take the rocks back structurally. We have no record for that, and I think the counsel say I also don't have the engineering background to know. That was in September 2023. A ruling issued in December 2023 saying I will grant an injunction. There was a request for clarification of the court. Is this an injunction? And she said no, I am not yet issuing an injunction. Now the significance of that is if there had been an injunction, we could have appealed, and we could have brought the matter to the court, but as we pointed out, under the last sentence of Rule 54B, if a ruling is interlocutory, it's subject to change until the entry of the final judgment. It was open to us to then furnish the record that had not been available when the court asked that question as we did then. Now, Mr. Field says she hadn't asked for the record, but she still had the duty to follow a correct interpretation of the law before she entered the injunction. I will note that contrary to the statements by the government and the OMC, that she said that we had waived something by not having the record of summary judgment, or that there was a forfeiture of some sort. Her opinion. Thank you. Okay, thank you. Your Honor, can I address 214 in 30 seconds? Yes. Briefly. 25 CFR 214.9 is not some obscure thing that the judge came up with. It is literally in the regulations on how leases can get paid off, specifically in the Osage Mineral Estate. Advanced rentals are what you pay to have the opportunity to have a lease and the exclusive right to mine. It's only when you then mine and produce something that royalties are also paid. So clearly, this is not something that the judge came up with. It's something that's in the regs specifically for this asset accordingly. Thank you. Hold on. Are you saying if you can't reach agreement on a new lease that you necessarily then get this advanced rental payment forever? Forever? You pay the advanced rental while you occupy it. That's the only way that you're able to occupy the area in question. So because Enel has never had a lease, they don't have the right to be there to begin with. So to pay $8,400 a year is a pittance compared to the million dollars that the surface owners are getting. It's just not equitable. Thank you. Thank you. Any more questions from the Court? No. All right. Thank you, counsel, for your arguments. The case stands submitted. Counsel's excused. And we are adjourned. Until tomorrow night.